IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 1, 2009

**STATE OF TENNESSEE v. JOSE A. INIGUEZ**

**Direct Appeal from the Circuit Court for Madison County**
**No. 08-519     Donald H. Allen, Judge**

———————————————————

**No. W2009-01067-CCA-R3-CD - Filed November 15, 2010**

———————————————————

Defendant, Jose A. Iniguez, was convicted by a Madison County jury of stalking, a Class A misdemeanor, and driving while unlicensed, a Class C. Misdemeanor. For stalking, the trial court imposed a sentence of 11 months, 29 days and for driving while unlicensed a sentence of 30 days, to be served concurrently in the county jail.  On appeal, Defendant's sole issue is a challenge to the sufficiency of the evidence for his stalking conviction. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Gregory D. Gookin, Jackson, Tennessee, for the appellant, Jose A. Iniguez.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; James G. Woodall, District Attorney General; and Brian Gilliam, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**I. Background**

The eighteen-year-old victim, Laura Jones, worked as a pharmacy technician in the Wal-Mart Pharmacy located on Emporium Drive in Jackson from August of 2007 until March of 2008.  She was married at the time, but her husband, a marine, was stationed in Iraq.  Around late November or early December of 2007, the victim observed Defendant in the pharmacy area staring at her.  Around fifteen minutes later, the victim noticed Defendant

walking around the area, and when she looked up, he was staring at her again. This made her feel uncomfortable and scared. After that, the victim saw Defendant on almost a daily basis walking up and down the isles of the pharmacy section and staring at her. He did not purchase anything in the pharmacy. The victim testified that Defendant walked up to her on several occasions and attempted to say "hey" or engage her in a conversation but she ignored him. Defendant "would stand there for a second and stare at [her] and then he would walk off after a couple of seconds." The victim eventually pointed Defendant out to Kyle Pinckley and Jud Jones, two of her co-workers. At one point during the month of December, Defendant attempted to give her a gift with a card. The victim told Defendant that she could not accept the gift or the card, and the pharmacist on duty told Defendant to leave her alone. Defendant then walked away. The victim saw Defendant in the pharmacy again the following day watching her.

The victim saw Defendant in the pharmacy almost daily throughout the remainder of December 2007 and through January 2008. She began having a male employee walk her to her car after work. On one occasion, Defendant ran up to the victim as she was entering Wal-Mart from the parking lot and attempted to speak to her. The victim informed Defendant that she was married and to leave her alone. Defendant then ran away, and the victim ran into Wal-Mart because she was afraid. On February 13, 2008, after leaving work in the pharmacy, the victim walked down the Valentine's Day isle to make a purchase, and she noticed that Defendant was behind her. The victim quickly left the store and walked to her truck parked in the Wal-Mart parking lot. She saw a card, a rose with a ring in it, and a teddy bear on the windshield of the vehicle. Inside the card read:

> It's so easy to tell you just about anything. Whether we trade stories or confide
> in each other, I can count on you to be sensitive and supportive. I want you to
> know how much I value you. Happy Valentines Day.

Defendant also wrote: "Every single February day is your birthday celebration." On the envelope, Defendant indicated that he loved the victim and wanted to take her to Mexico to meet his family and be his wife. He also mentioned the earlier gift that he attempted to give her. Defendant included a business card from Lexington Plastics Co. with the name "Angel" written on it, and a phone number which was circled. Angel is Defendant's middle name. The victim was "absolutely terrified." She testified: "I was afraid of him kidnapping me and taking me to Mexico. I could have been raped. He could have tried to sell me. I had all kinds of crazy thoughts going through my head." The victim never told Defendant that she wanted to marry him or go to Mexico.

The victim took the items from her windshield, got into her truck, and saw a police officer parked at a nearby Walgreen's. She drove to the officer and turned the items over to

him and explained what had been going on with Defendant. The officer advised the victim to keep Defendant in the pharmacy if he showed up again and to contact police. The victim saw Defendant in the pharmacy again on February 15, 2008, walking down the isles and staring at her. The victim initially ignored him or walked to another area of the pharmacy to fill prescriptions. However, when she returned to the counter, Defendant was still in the pharmacy area.

On February 24, 2008, Defendant came into the pharmacy, and the victim had someone call police. By the time they arrived, Defendant was gone. Police were called a second time when Defendant returned to the pharmacy later that evening. The victim attempted to keep him there by asking him to translate for a customer who spoke only Spanish. The victim walked away, and the pharmacist continued talking with them. Defendant was later arrested down the road from Wal-Mart, and police brought him back to the store where he was identified by the victim. The victim eventually took out an order of protection against Defendant.

The victim testified that she had initially contacted police after Defendant attempted to give her the first gift in December. She did not contact police earlier because she thought that she was overreacting, and she hoped that Defendant would leave her alone. However, Defendant's attempt to give her a gift helped her realize that she was not overreacting. Concerning her feelings, the victim testified:

> After the first couple of weeks, I was paranoid. You know, I was scared. You know, like I said, I lived alone and it made me nervous. But the more it kept going on and once the gift was given, I started getting really scared and paranoid and then by the time [sic] Valentines thing happened and talking about taking back to Mexico, I was very upset, like, all the time.

The victim estimated that she told Defendant to leave her alone at least four or five times, and the pharmacist also told Defendant to leave her alone. However, she was not successful in getting him to leave her alone until he was arrested.

Jud Jones, a pharmacist and manager of the Wal-Mart pharmacy, worked with the victim from November 2007 through February 2008. He became aware of the problem with Defendant when the victim came back to the pharmacy and "appeared distressed and uncomfortable." Mr. Jones did not see Defendant on every occasion that he was in the pharmacy, but he saw Defendant at least twice standing around the pharmacy area. He also identified Defendant in the courtroom. Mr. Jones could tell that the victim was "very uncomfortable and very distressed and definitely not happy with what was going on." He thought that this went on for "[t]wo or three months probably."

Kyle Pinckley, an employee of the Wal-Mart pharmacy, testified that he worked with the victim and noticed Defendant in the pharmacy on several occasions, and the victim pointed Defendant out to him. He said that the victim tried to get him to act like her husband in an attempt to scare Defendant away because the victim was "getting a little freaked out by him." Mr. Pinckley testified that when Defendant was around, the victim would hide behind something or go to the restroom so that Defendant could not see her. He felt that Defendant knew when the victim was at work because Defendant knew what type of truck she drove. Mr. Pinckley knew that Defendant had given the victim some gifts, and he remembered a Christmas card "that had some lights around a dog . . ." He also saw another card where Defendant had written on the envelope. Mr. Pinckley testified that the victim "got really freaked out" after receiving the card "because [Defendant] was saying he was going to take her back to Mexico to meet his family." After that, Mr. Pinckley became concerned for the victim's safety and began walking her to her truck when her shift ended.

Officer Alan Randolph of the Jackson Police Department testified that on February 24, 2008, he stopped Defendant around 5:20 p.m. after receiving a BOLO (be on the lookout) for Defendant's vehicle. Officer Randolph testified that he was aware of the situation from talking to his partner who "had dealt with a similar situation at Wal-Mart on Emporium Drive dealing with a reported stalking incident." He said that "[a]nother officer was dispatched later on second shift of that same incident and I happened to be in the area and responded to the situation." After conferring with the officer who was dispatched to Wal-Mart and "determining if he had probable cause," Officer Randolph arrested Defendant for stalking and driving without a license. He placed Defendant in the back of his patrol car and transported him to Wal-Mart.

Field Training Officer Tikal Greer testified that he assisted Officer Randolph with the stop of Defendant, and he later transported Defendant to jail. Defendant told him that he did not do anything wrong and that he had just been following the victim. Defendant also said that there was nothing wrong with following her. Officer Greer did not ask Defendant any questions.

Sergeant Al Colon, who is fluent in both Spanish and Italian, testified that he was assigned to the investigation the day after Defendant's arrest. He said that Defendant spoke Spanish and broken English. Sergeant Colon spoke with Defendant and advised him of his rights in both English and Spanish. Defendant, who was very cooperative, then executed a written waiver in both languages and gave the following statement:

I have known her since December. I bought her a gift and she did not take it. I got her a card on February 13th asking her to marry me. She said no. Yesterday I went to Wal-Mart to get some Benadryl. I was in the pharmacy

and she called me and asked me to translate for her because there was another Hispanic male there that did not speak English. I told her what he wanted and then she went to the back and did not return until later. I waited for her and when she returned I told her the guy left and said he was going somewhere else to get his medication. I got my medication and left. I went to mass. It started at 10:30. I left another mass and went back to Wal-Mart to get some soda to take to a party. I did not see her when I went to Wal-Mart to get the soda. I paid for the soda and then was stopped by police. They brought me back to Wal-Mart and she came out with the police officer and they then took me to jail. I did not go to Wal-Mart after mass. I went to a couple of stores before going to Wal-Mart to get the sodas.

The forty-nine-year-old Defendant testified that he was living in Lexington, Tennessee at the time of the offenses, and that he had never been married. He first saw the victim in November of 2007 in the Wal-Mart parking lot. He said that she was "very nice" and allowed him to pull out in front of her truck as they were leaving the parking lot. Defendant testified that he later saw the victim while he was shopping in Wal-Mart, and they had a conversation. He said that the victim was again very nice and told him that she was working at Wal-Mart, and she showed the pharmacy area to him. Defendant testified that although he lived in Lexington, he began frequenting the Wal-Mart in Jackson because he attended a nearby church, and he attended Alcoholics Anonymous (AA) meetings in the area.

Defendant testified that initially he gave the victim a friendship card which she accepted, because she had been nice to him. He next purchased a $10 bottle of perfume and attempted to give it to the victim for Christmas, but a pharmacy employee told him that the victim would not accept the gift. He thanked the person and left. Defendant testified that he was not in the Jackson Wal-Mart often because he lived and worked in Lexington at Lexington Plastic.

Defendant testified that he left the Valentine's Day gifts and card because he wanted to show the victim that she was important to him, and he would take care of her. He said that the victim never told him that she was married. Defendant testified that in Mexico, he would ask a woman to marry him in the manner that he asked the victim, and he understood that American culture is different in some ways than that of Mexico. He placed his sister's phone number on the Valentine's Day card because his sister speaks fluent English, and he wanted the victim to know that he had a "good record" and did not have a wife in Mexico. Defendant testified that on the day of his arrest, he initially went inside Wal-Mart to purchase something for his throat. He went there a second time later that day to purchase soda for a dinner party. He was then arrested after he left the store. Defendant said that he did not

intend to hurt or assault the victim, and he did not intend to force her to go to Mexico with him. He only wanted to marry the victim.

On cross-examination, Defendant testified that the victim never told him to leave her alone. He said that the victim misunderstood the meaning of his card and that he only wanted to take her to Mexico for a honeymoon. He admitted that he did not know the victim's name at the time he gave her the Valentine's Day card and gifts. Defendant testified that he did not learn that the victim was married until she told him on February 18, 2008. He then decided not to continue to pursue her. Defendant estimated that he went to the pharmacy seven times to see the victim from November to February. He was in Wal-Mart on other occasions to shop.

## II. Analysis

Defendant contends that the evidence is insufficient to support his stalking conviction. We disagree. When a defendant challenges the sufficiency of the evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.*; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn.1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn.1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

To sustain a conviction for stalking, the State must prove that Defendant engaged in a "willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested, and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested." T.C.A. §39-17-315(a)(4). A "course of conduct" is defined as "a pattern of conduct composed of a series of two (2) or more separate noncontinuous acts evidencing a continuity of purpose." T.C.A. § 39-17-315(a)(1) "Harassment" is defined as "conduct directed toward a victim that includes, but is

not limited to, repeated or continuing unconsented contact that would cause a reasonable person to suffer emotional distress, and that actually causes the victim to suffer emotional distress." This does not include "constitutionally protected activity or conduct that serves a legitimate purpose." T.C.A. § 39-17-315(a)(3). The statute further provides:

> "Unconsented contact" means any contact with another person that is initiated or continued without that person's consent, or in disregard of that person's expressed desire that the contact be avoided or discontinued. Unconsented contact includes, but is not limited to, any of the following:
>
> (A) Following or appearing within the sight of that person;
>
> (B) Approaching or confronting that person in a public place or on private property;
>
> (C) Appearing at that person's workplace or residence;
>
> (D) Entering onto or remaining on property owned, leased, or occupied by that person;
>
> (E) Contacting that person by telephone;
>
> (F) Sending mail or electronic communications to that person; or
>
> (G) Placing an object on, or delivering an object to, property owned, leased, or occupied by that person[.]

T.C.A. § 39-17-315(a)(5).

In this case, the proof shows that Defendant repeatedly showed up at the victim's place of employment, a Wal-Mart pharmacy in Jackson, for a period of nearly three months from November of 2007 until February of 2008 and stared at her. He walked up to her on several occasions and attempted to say "hey" or engage the victim in conversation but she ignored him. During the month of December, Defendant approached the victim and attempted to give her a gift and a card, which she refused. At that point, the victim's co-worker told Defendant to leave her alone. On one occasion, Defendant ran up to the victim as she was entering Wal-Mart from the parking lot and attempted to speak to her. The victim informed Defendant that she was married and to leave her alone. On February 13, 2008, after leaving work in the pharmacy, the victim walked down the Valentine's Day aisle in Wal-

Mart and noticed that Defendant was behind her. She quickly left the store and walked to her truck. She saw a card, a rose with a ring inside, and a teddy bear on the windshield of the vehicle. On the card's envelope, Defendant indicated that he loved the victim and wanted to marry her. He also expressed his desire to take her to Mexico. The victim estimated that she told Defendant to leave her alone at least four or five times; however, his conduct continued until his arrest. The victim testified that Defendant's actions caused her to be afraid, and she began having a male pharmacy employee walk her to her vehicle after work. She was "absolutely terrified" after finding the items on her windshield. The victim testified: "I was afraid of him kidnapping me and taking me to Mexico. I could have been raped. He could have tried to sell me. I had all kinds of crazy thoughts going through my head."

Based on the foregoing, we conclude that the evidence is sufficient to support Defendant's conviction of stalking. Defendant is not entitled to relief on this issue.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE